**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| JAMUNA REAL ESTATE, LLC | : CASE NO. 04-37130 |
| BAGGA ENTERPRISES, INC. | : CASE NO. 04-37132 |
| UNITED MANAGEMENT SERVICES, INC. | : CASE NO. 04-37136 |
| DEBTORS | : |

| | |
|---|---|
| MARVIN KRASNY, CHAPTER 7 | : |
| TRUSTEE OF JAMUNA REAL ESTATE LLC; | : |
| MARVIN KRASNY, CHAPTER 7 | : |
| TRUSTEE OF UNITED MANAGEMENT | : |
| SERVICES,INC.; GARY SEITZ, | : |
| CHAPTER 7 TRUSTEE OF | : |
| BAGGA ENTERPRISES, INC.; | : |
| AND FL RECEIVABLES TRUST 2002-A | : |
| PLAINTIFFS | : |
| v. | : |
| PRATPAL BAGGA; KHUSHVINDER BAGGA; | : |
| RAVINDER CHAWLA; HARDEEP CHAWLA | : |
| WELCOME GROUP, INC.; K&P REAL | : |
| ESTATE LLC; WORLD APPAREL PRODUCTS, | : |
| INC. D/B/A SJM TRADING CO., D/B/A | : |
| TEN TIGERS; AMERICAN MERCHANDISE | : |
| CO., INC., A/K/A AMERICAN | : |
| MERCHANDISING CO., INC.; | : |
| 21ST CENTURY RESTAURANT SOLUTIONS, | : |
| INC.; BRAND TRADE, INC.; | : |
| HB PROPERTIES, INC.; | : ADV. NO. 06-0128 |
| HB PROPERTIES LLP; SANT PROPERTIES; | : ADV. NO. 06-0129 |
| JOHN AND JANE DOES AND ABC | : ADV. NO. 06-0130 |
| COMPANIES | : |
| DEFENDANTS | : |
| | : |

# OPINION

BY: STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

## I.  Introduction.

Before the Court is a Motion for partial summary judgement filed by a subset of the

multiple defendants in the above adversary proceeding.  The Movants seek judgement in their

favor on Count I (Violation of RICO, 18 U.S.C. § 1962(c) and Count II (Conspiracy to Violate

RICO, 18 U.S.C. § 1962(d) of the Plaintiffs' Complaint.  The Motion is vigorously opposed, but

by only one of the three Plaintiffs.  The Motion is premised on alleged lack of standing.  A

hearing on the Motion was held on January 17, 2008.  For the reasons which follow, the Motion

will be granted.

## II.  Legal Standard.

*Standard for Summary Judgment*

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil

Procedure ("Fed.R.Civ.P.").  Pursuant to Rule 56, summary judgment should be granted when

the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). For purposes of Rule 56, a

fact is material if it might affect the outcome of the case. *See Anderson vs. Liberty Lobby, Inc.*,

477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the

burden of demonstrating that no genuine issue of fact exists. *Celotex Corp. vs. Catrett*, 477 U.S.

317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The court's role in deciding a motion for summary judgment is not to weigh evidence, but

rather to determine whether the evidence presented points to a disagreement that must be decided

at trial, or whether the undisputed facts are so one sided that one party must prevail as a matter of

law.  *See Anderson vs. Liberty Lobby, Inc.*, 477 U.S. at 251-252, 106 S.Ct. at 2512.  In making

this determination, the court must consider all of the evidence presented, drawing all reasonable

inferences therefrom in the light most favorable to the nonmoving party, and against the movant. *See United States vs. Premises Known as 717 South Woodward Street*, 2 F.3d 529, 533 (3rd Cir.1993); *J.F. Feeser, Inc. vs. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991); *Gould, Inc. vs. A & M Battery and Tire Service*, 950 F.Supp. 653, 656 (M.D.Pa.1997).

To successfully oppose entry of summary judgment, the nonmoving party may not simply rest on its pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute. *Celotex Corp. vs. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson vs. Liberty Lobby, Inc.*, 477 U.S. at 256, 106 S.Ct. at 2514. Such evidence must be sufficient to support a jury's factual determination in favor of the nonmoving party. *Id.* Evidence that merely raises some metaphysical doubt regarding the validity of a material fact is insufficient to satisfy the nonmoving party's burden. *Matsushita Electric Industrial Co., Ltd. vs. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the nonmoving party fails to adduce sufficient evidence in connection with an essential element of the case for which it bears the burden of proof at trial, the moving party is entitled to entry of summary judgment in its favor as a matter of law. *Celotex Corp. vs. Catrett*, 477 U.S. at 322-23, 106 S.Ct. at 2552.

### III.  Background.

#### A.  The Parties

##### 1.      Plaintiffs

The principal plaintiff in this litigation is FL Receivables Trust 2002-A, a special purpose business trust organized under the laws of the State of Delaware.  (Hereinafter "FL

Receivables"). The other two plaintiffs are the Chapter 7 Bankruptcy Trustees of the borrower

entities discussed infra. The Trustees have played a nominal role in this litigation. The instant

Motion challenges only the standing of FL Receivables, apparently because Movants proceed on

the assumption that the Trustees themselves do not even assert the RICO claims.[1] In this regard,

they emphasize that the Complaint itself fails to allege that the Trustees were "injured" by the

misconduct alleged, only that FL Receivables was, and, moreover, that even were it otherwise

the Trustees would lack standing, inasmuch as they stand in the shoes of the debtor entities and

can only assert those causes of action possessed by the Debtors. *See: McNamara vs. PFS (In re*

*the Personal & Business Insurance Agency)*, 334 F.3d 239, 245 (3rd Cir. 2000).

The Court notes, nevertheless, that the preamble to Courts I and II of the complaint does,

recite that it is brought by the Plaintiffs (plural), and the prayer for relief in both counts likewise

seems to include all Plaintiffs. FL Receivables did not address the standing of the Trustees, nor

did the Trustees seek to be heard on the issue. For the sake of economy, the Court also operates

on the assumption that the Trustees do not, for their part, seek to assert the RICO claims, which

will be dismissed in accordance with this Opinion. The foregoing is subject, of course, to the

caveat that, if the Court's assumption is incorrect, invitation is freely given to seek

reconsideration of the dismissal as to the Trustees, inasmuch as the issue, arguably, was never

properly joined as to them.

### 2. **Defendants**.

The named Defendants may be characterized as belonging to one of two categories.

---

[1] This Court endorsed this point of view in its Opinion of April 25, 2007, *In re Jamuna Real Estate LLC* 365 B.R. at 540, 558-559. (Bankr. E.D. Pa. 2007)

Bratpal Bagga, Khushvider Bagga, Welcome Group, inc., K&P Real Estate, LLC, American

Merchandising Co., Inc., 21st Century Restaurant Solutions, Inc., and Brand Trade, Inc..

Generally speaking these Defendants had, more or less, a direct involvement with the loan

transactions which are more fully described infra, and which form the genesis of the RICO

claims at issue. They are hereinafter referred to as the "Bagga Defendants," with the subject

loans being referred to as the "Bagga Loans."

Defendants Ravinder Chawla, Hardeep Chawla, World Apparel Products, Inc. d/b/a SJM

Trading Company, d/b/a Ten Tigers, HB Properties, Inc., HP Property, LLP, and Sant Properties

comprise the remaining Defendant category. The Chawlas, who are brothers, are cousins of the

Baggas. Generally speaking, the Complaint alleges that the Baggas and the Chawlas, together

with the business enterprises each family controlled, engaged in the alleged conspiracy and

racketeering activity which underpins the RICO claims. The Chawlas and their Companies are

hereinafter referred to as the "Chawla Defendants." The present Motion is brought by the

Chawla Defendants only.

### B. Procedural History

By any measure that might be used to gauge it, this is a complex litigation. It involves,

as noted above, three Plaintiffs, and twelve named Defendants (in addition to an unspecified

number of John and Jane Doe and ABC Company Defendants). As filed, the Plaintiffs'

Complaint runs to 274 paragraphs and consists of 15 separate counts alleging federal

racketeering and state common law claims. (Many of these have since been dismissed in an

Opinion and Order dated April 25, 2007. *See In re Jamuna Real Estate, LLC,* 365 B.R. 540

Bankr. E.D.Pa. 2007). The parties' disputes relate to loan transactions (the Bagga Loans) which

began in the year 2000 and ultimately totaled approximately $4,000,000.  The damages alleged

at this juncture, have grown to exceed $11,000,000, fully $6,000,000 of which represents alleged

attorneys fees and expenses.   Litigation relative to the loan transactions was initially

commenced in state court in Florida.  As time passed, the disputes found their way into federal

court in Pennsylvania.  This Court is, in fact, the third federal tribunal in Philadelphia to address

the controversy.

 The Court makes the foregoing observations for the purpose of drawing attention to the

anomalous fact that the Motion presently before it implicates a fundamental issue of such

threshold significance that it is puzzling, at the very least, that it has only recently come to the

forefront.  The Movants perhaps recognize this, as in their supporting legal brief they state that

their Motion is grounded on the simple notion that Plaintiff FL Receivables does not own the

RICO claims that it asserts in the Complaint, and that it therefore lacks standing to sue.  The

Court agrees that the standing requirement is simple enough.  Its determination in the present

case, however, is not necessarily so.

 A great many of the factual allegations incident to the parties' disputes are recounted in

the Court's April 2007 Opinion and all will not be repeated here.  A brief recitation of operative

facts, particularly those of a chronological and procedural nature should help, however, to place

the present Motion in context and add clarity.

 The saga seems to have begun innocently enough, with a series of loans being made for

the ostensible purpose of enabling would-be entrepreneurs to establish Arby's Roast Beef

Franchise Restaurants.  The lender in the first instance was an entity known as Captec Financial

Corporation, together with its affiliate companies (collectively "CAPTEC").  CAPTEC was

6

funded, in turn, by an entity known as Prudential Securities Credit Corporation ("PSCC")

The terms of the relationship between CAPTEC and PSCC are memorialized in a lengthy document dated August 3, 1998 and denominated as an Interim Warehouse and Security Agreement (FL Receivables Appendix - Exhibit "A"). Under this agreement, as CAPTEC made franchise loans it would contemporaneously pledge the same to PSCC as collateral for its own funding.[2]

Although the point is not conceded, it would appear uncontested that the Bagga Loans went into default almost immediately. Eventually (in 2002) litigation arose between PSCC and CAPTEC in Florida state court. That litigation was settled by the parties pursuant to a document dated August 12, 2002 entitled *Settlement Agreement and Mutual Release*. (Hereinafter the "Settlement Agreement") (FL Receivables Appendix - Exhibit "F") Under the Settlement Agreement, CAPTEC was released from liability to PSCC and in exchange transferred to PSCC all of its right, title and interest in, inter alia, the Bagga Loans.

According to FL Receivables, PSCC did not want to hold the Bagga Loans in its own name, because PSCC hoped in the future to package a portfolio of such franchise loans for sale to investors. Acting on this hope, PSCC created FL Receivables to be the repository of certain of the assets it was to receive from CAPTEC.[3] In furtherance of this, PSCC had CAPTEC

---

[2] PSCC apparently also made direct loans to franchisees for the purchase of restaurant equipment, but except as discussed infra at page 26 this does not appear to have relevance for present purposes.

[3] The relationship between PSCC and FL Receivables is memorialized in 1) an Owner Trust Agreement dated Augusgt 22, 2002 among Wilmington Trust Company as Owner/Trustee and PSCC as Initial Certificate Holder, and 2) an Administration Services Agreement dated

(continued...)

execute 1) a document dated September 26, 2002, entitled *Assignment Agreement* (Hereinafter

the "Assignment") (FL Receivables Appendix - Exhibit "G") and 2) a document dated August

20, 2002 entitled *Limited Power of Attorney.* FL Receivables Appendix - Exhibit "H")

It appears that while PSCC and CAPTEC were in litigation, CAPTEC commenced

separate litigations in the United States District Court for the Eastern District of Pennsylvania

against the borrowers and guarantors of the Bagga Loans.  (Hereinafter referred to as the

"Collection Actions") Judgment by default was eventually entered in favor of CAPTEC in the

Collection Actions.  The judgements in the Collection Actions were subsequently assigned to FL

Receivables.  It is FL Receivables' contention that, in the course of discovery taken in aid of

execution in the Collection Actions, it uncovered the facts supporting the numerous causes of

action, including the RICO claims, which are asserted in its Complaint and described in detail in

this Court's April 2007 Opinion.

The present Complaint, it should be noted, is not the first occasion on which FL

Receivables has asserted its claims. On the contrary, in 2003, FL Receivables initiated a

substantially similar civil action in the United States District Court for the Eastern District of

Pennsylvania.  Ironically, the Defendants moved to dismiss the RICO claims in that action

through arguments which included, inter alia, a challenge to the Plaintiffs' standing predicated

on grounds of ripeness.  In that instance the Movants argued that FL Receivables could not

demonstrate legally cognizable injury (a predicate element of a RICO claim), because the

---

[3](...continued)
August 22, 2002 between FL Receivables and PSCC (the former agreement is attached to FL
Receivables' Appendix as Exhibit I and the latter is attached to the Appendix as Exhibit "J")

Collection Actions remained unresolved and the Plaintiffs' injury thus remained "speculative and contingent on future events."  This argument prevailed and the RICO claims were dismissed.[4]

FL Receivables thereafter returned its attention to the Collection Actions.  This tactic was thwarted, however, in December 2004 when the borrower entities filed Chapter 7 Bankruptcy cases in this Court.  Ironically, these filings, at a minimum, enabled FL Receivables to avert further challenges to its RICO standing based on ripeness.  FL Receivables, together with the Chapter 7 Trustees of the Bankrupt borrowers, thereafter filed the present adversary proceeding.

Prior to filing their Dismissal Motion both Defendant groups had filed a Motion in the District Court seeking withdrawal of the automatic reference of the adversary proceeding to this Court.  This request was denied in January 2007.  Following this Court's partial denial of the Motion to Dismiss the Adversary Proceeding in April 2007, the case unfolded here with protracted, acrimonious discovery.  Regrettably, delays associated with discovery have caused concomitant delay in advancing the present Motion (filed in October, 2007) to resolution.  As noted above, however, the matter is now ripe for disposition.

## IV.  Discussion.

### A. Standing Requirement

The gravamen of the Movants' argument is straightforward.  Standing, say the Movants, is a necessary constitutional prerequisite to the invocation of federal jurisdiction.  They argue that the standing requirement is not met here.  In at least one respect their argument is indeed

---

[4]  *See FL Receivables Trust v. Bagga, et al* 2005 WL 563535*6 (E.D. Pa.)

unassailable: standing is essential.  It is beyond cavil that federal courts must determine that they

have jurisdiction before proceeding to the merits of a case.  *Lance vs. Coffman*, __ U.S. __, 127

S.Ct 1194, 1196 (2007).   Article III of the Constitution limits the jurisdiction of federal courts to

"cases" and "controversies."  One component of the case-or-controversy requirement is standing,

which requires a plaintiff to demonstrate the now familiar elements of injury-in-fact, causation

and redressability.  *See Lujan vs. Defenders of Wildlife,* 504 U.S. 555, 560-561, 112 S.Ct. 2130,

2136, 119 L.Ed.2d 351 (1992) The requirement of standing is not subject to waiver.  *United*

*States vs. Hays*, 515 U.S. 737, 742, 1155 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995).

FL Receivables takes no issue with the proposition that standing must be demonstrated

and that it bears the burden of proof with respect to such demonstration.  It maintains however

that, through the supporting papers filed in response to the instant Motion, it has met its burden.

Having carefully reviewed the record against principles of controlling law, the Court must

disagree.

### B.  FL Receivables' Standing

As discussed above, the Motion seeks judgment on the RICO counts of the Complaint.

A party has standing to assert claims under 18 U.S.C. § 1962, the civil RICO  statute, where it

was directly harmed by the defendants' conduct, *see* 18 U.S.C. § 1964(c)  ("any person injured

in his business or property by reason of a violation of section 1962  of this chapter may sue

therefor in any appropriate United States district court and shall  recover threefold the damages

he sustains and the cost of the suit, including a reasonable  attorney's fee") or where it receives a

valid assignment from someone who has been so harmed.  *Lerman vs. Joyce International, Inc*.,

10 F.3d 106, 113 (3d Cir. 1993)

The Movants concede that RICO claims may be assigned, and that validly assigned

RICO claims are actionable.  Where the parties part company is over the deceptively simple

question of whether there has been a valid assignment of RICO claims in this case.

The Movants argue that there has not been a valid assignment of such claims.  In support

they direct the Court's attention to *Lerman*, *supra*, and its forerunner *Gulfstream III Assoc., Inc.*

*vs. Gulfstream Aerospace Corp.,* 995 F.2d 425 (3d Cir. 1993).  Under the holdings of these

decisions, say the Movants, FL Receivables cannot satisfy the standing requirement.  FL

Receivables agrees that the foregoing cases represent controlling authority, but it interprets them

differently than the Movants and insists that the decisions compel a ruling in its favor.  Careful

analysis of these precedents is thus central to resolution of the issue *sub judice*.

### 1.  Gulfstream

In *Gulfstream*, an aircraft buyer instituted an antitrust action against seven manufacturers

of business jet aircraft.  Six of the Defendants settled. The seventh resisted and urged, among

other things, that the Plaintiff lacked standing with respect to one of its claims because it had

unconditionally assigned its antitrust rights when it transferred its interest in a particular plane

and the related purchase agreement to a third party.  995 F.2d at 429-430.  Noting that under

controlling federal law antitrust claims are assignable, and that the validity of such assignments

is determined by federal common law, the Court of Appeals identified the question as being

whether the general assignment before it encompassed the Plaintiffs' antitrust claim, despite the

fact that it was not specifically identified in the assignment that transferred all of the Plaintiffs'

interest in the plane and purchase agreement.  *Id.* at 431.

The Court held that a general assignment did not operate to transfer antitrust claims.  *Id.*

at 437.  Rather, it said, only an express assignment of an antitrust claim can be valid.  *Id.*  Put differently, "general assignments without specific reference to antitrust claims cannot validly transfer the right to pursue those claims." 995 F.2d at 440.

In *Gulfstream*, the Court of Appeals clearly articulated the prudential concerns which informed its decision.  The inclusion of antitrust claims in a general assignment, it said, would run afoul of the direct purchaser rule enunciated by the Supreme Court in *Illinois Brick Co. vs. Illinois*, 431 U.S. 720, 736, 77 S.Ct. 2061, 2070, 52 L.Ed.2d 707 (1977), and *Kansas vs. Utilcorp. United, Inc.,* 497 U.S. 199, 208, 110 S.Ct. 2807, 2812, 111 L.Ed.2d 169 (1990).  The direct purchaser rule had its genesis in an earlier Supreme Court decision in *Hanover Shoe, Inc., vs. United Shoe Mach. Corp.*, 392 US. 481, 488, 88 S.Ct. 2224, 2228, 20 L.Ed.2d 1231 (1968), which held that a Clayton Act defendant could not assert a defense that the plaintiff had suffered no injury because it had passed on any illegal overcharges to consumers.  *Illinois Brick* took matters a step further (making the rule bilateral) in holding that the State of Illinois, as the indirect purchaser of concrete block, could not pursue price fixing claims against manufacturers. 431 U.S. at 735, 77 S.Ct. at 2069.   Those could only be pursued, held the Court, by the masonry contractors who directly purchased the product. *Id.*

In *Gulfstream*, the Circuit Court stated that the direct purchaser rule was founded, inter alia, on the difficulty of analyzing pricing decisions, the risk of multiple liability for defendants and the weakness of private antitrust enforcement that might result from splitting damages for overcharges among direct and indirect purchasers. 995 F.3d at 439.

Of significance, the Circuit Court noted that in *Kansas vs. Utilcorp.*, the Supreme Court had issued a clear admonition that it "would be an unwarranted and counterproductive exercise

to litigate a series of exceptions to the direct purchaser rule."  995 F.2d at 440 quoting *Utilcorp*

497 U.S. at 217, 110 S.Ct. at 2817.

### 2.  **Lerman**

The *Lerman* decision was issued six months after the Circuit Court's decision in

*Gulfstream*.  The *Lerman* case involved an action brought by a former employee against the

buyer of a business for breach of a severance agreement.  10 F.3d at 108.  The Buyer

counterclaimed, asserting, inter alia, federal RICO claims.  *Id.*  The RICO defendants belatedly

raised the assignment issue implicated in *Gulfstream*, maintaining that the counterclaimant could

not assert RICO claims because his assignment of such claims from the business seller had not

been express.  *Id.*  The Circuit Court disagreed.  *Id.* at 112.

*Gulfstream,* of course, had not involved RICO claims, and the Circuit Court

acknowledged at the outset of its discussion that as a general rule "terms of art are not required

for a valid assignment."  *Id.* at 112.  The Court further acknowledged that in *Gulfstream* it had

promulgated a new rule of law insofar as the assignment of antitrust claims was concerned.  *Id.*

In *Lerman,* the Court extended the *Gulfstream* express assignment requirement to RICO claims,

stating as follows:

> [ ] . . . in *Gulfstream III Associates, Inc. v. Gulfstream Aerospace
> Corp.,* 995 F.2d 425, 438-40 (3d Cir.1993), we held that an
> assignment of a claim under Section 4 of the Clayton Act, 15
> U.S.C. § 15, must be "express."  Since this provision served as the
> model for the provision of the RICO statute authorizing private
> civil actions, 18 U.S.C. § 1964, we assume that an assignment of a
> RICO claim must also be "express." (Footnote omitted.)

*Id.*

In *Lerman*, the Court reiterated its *Gulfstream* concern that interpreting a general

13

assignment to include antitrust claims would entail several highly speculative inquires, which, it

stated, would be obviated by an express assignment rule which entirely eliminated any problems

of split recoveries or duplicative liability. *Id.*

Having said as much, and of importance for present purposes, the Court went on to

conclude that the assignment in *Lerman* did not violate the rule set out in *Gulfstream*.  *Id.*  In

*Lerman* the assignment expressly assigned " all . . . causes of actions, . . . claims, and demands of

whatsoever nature."  *Id.*  In *Gulfstream*, on the other hand, the purchase agreement made no

reference to legal causes of action or claims.  Rather, it referred only to *Gulfstream's* "right, title

and interest" in the aircraft and the contract with the manufacturer. *Id.*  The *Lerman* Court thus

distinguished *Gulfstream*.  It elaborated on its rationale for doing so, as follows:

> [  ] The *Gulfstream* court appears to have been troubled by the
> difficulty of determining on a case-by-case basis whether an
> assignment such as the one in that case had been intended by the
> parties to transfer antitrust claims. The wording of the assignment
> in this case, however, could not reasonably lead to such difficulty.
> The assignment refers to "all of" LOPC's "causes of action" and
> "claims ... of whatsoever nature." This language is unambiguous
> and all-inclusive. Consequently, we hold that this assignment is
> "express" within the meaning of *Gulfstream.*

*Id.*[5]

### 3.  **FL Receivables' Assignment**

---

[5]   The Movants note that the *Lerman* opinion does not address the question of whether
the express assignment rule applies to RICO conspiracy claims under 18 U.S.C. § 1962(d).  FL
Receivables has not discussed this issue and the Movants acknowledge that there are
no decisions on point.  The Movants argue, however, that because the cause of action created under
18 U.S.C. § 1964 includes "any violation of Section 1962, the express assignment rule must
perforce apply to both RICO and RICO conspiracy claims.  The Court finds this logic sound.

The *Lerman* Court made clear that "terms of art" are not required to validly assign RICO claims, so certainly there is no need to specifically recite the term RICO to validate an assignment of RICO claims.  Nevertheless, the Court's discussion in *Gulfstream* and *Lerman* also makes clear its disfavor for the creation of exceptions to the express assignment rule. Against this backdrop, the inquiry shifts to an examination of the documentation upon which FL Receivables lays claim to standing for it RICO claims.

At the outset, the Court must address a collateral but hardly insignificant question; to wit: must the express assignment of RICO claims be contained in the assignment document itself, or can the "express" intent to assign RICO claims be discerned through consideration of more than one document?  This is important, because not even FL Receivables would contend that the CAPTEC Assignment satisfies the *Lerman*, let alone the *Gulfstream* test.  The CAPTEC assignment describes the assets assigned by CAPTEC to FL Receivables, as follows:

> [A]ll their right, title and interest in, to and under (i)  the Contracts, (ii) the Contract Files, (iii) all related  escrow accounts and funds on deposit therein, (iv) all  funds, checks and other items on deposit in the  Collection Account and the related lockbox, (v) all accounts, chattel paper, instruments and general  intangibles (as defined in the applicable Uniform  Commercial Code) with respect to the foregoing, and  (vi) all proceeds of the foregoing (collectively, the  Transferred Assets").

This is without question a general assignment.  It contains no reference whatsoever to legal claims, causes of action, etc.  If the inquiry ends here, the result is clear; FL Receivables lacks standing and its RICO claims must be dismissed.  The Movants did not address themselves in their legal memoranda to the question of whether in the course of its inquiry the Court may consider documentation beyond the document actually entitled "Assignment," however the issue

15

was discussed during oral argument.  Needless to say, FL Receivables maintains that such an

expanded inquiry is not precluded.  Indeed, it referred the Court to *Kroblin Refrigerated Xpress,*

*Inc. vs. Pitterich*, 805 F.2d 96 (1986), for the proposition that, as a general rule of contract law,

"where two writings are executed at the same time and are intertwined by the same subject

matter, they should be construed together and interpreted as a whole, each one contributing to

the ascertainment of the true intent of the parties."  *Id.* at 107.  In other words, argues FL

Receivables, the Court must consider the entirety of the transactional documentation in the

course of deciding whether the express assignment rule is met in this instance.  This is hardly

surprising, because FL Receivables has pinned its hopes to language appearing elsewhere than in

the CAPTEC Assignment.

For their part, the Movants acknowledge that the *Lerman* decision, which considerably

relaxed the *Gulfstream* test, is silent on the question.  The Movants urge, however, that the better

reading of *Lerman* is that, as a matter of law, it precludes the consideration of documents other

than the penultimate "assignment."  The Court disagrees.

Although both *Gulfstream* and *Lerman* involved a single "assignment" document, the

Court views the *Lerman* Court as having sufficiently evinced its position that, to a certain extent,

a somewhat holistic approach to the issue is permissible.  In *Lerman*, the court could easily have

adhered to the stricter approach it had enunciated in *Gulfsream*, but it did not do so.  It strikes

this Court as improbable that, having held that a general assignment of legal claims and causes

of action could satisfy the express assignment requirement for RICO claims, the same Court

would negate the expression of such intent were it to be satisfactorily manifested in more than a

single document.  Accordingly, the Court has considered the additional evidence which FL

Receivables, has furnished in support of its standing.  Unfortunately for FL Receivables, the

Court finds its evidence wanting.

FL Receivables predicates its claim to standing on three documents: the PSCC/CAPTEC

Settlement Agreement; the CAPTEC/FL Receivables Assignment; and the CAPTEC/FL

Receivables Limited Power of Attorney.  Taken together, it says, and read as a whole, these

documents satisfy the express assignment requirement.  The Court will address them all; first

separately, then collectively.

### (a)  The Assignment Agreement

Little can be said of the Assignment beyond that already said.  By any measure it is a

general assignment of the sort deemed completely unacceptable by both the *Gulfstream* and

*Lerman* Courts.  In particular, it contains no reference whatsoever to legal claims, causes of

action, demands, etc.  Standing alone, it is no help to FL Receivables.

### (b)  The Settlement Agreement

The Settlement Agreement is likewise of little help where express language is needed.

FL Receivables notes, accurately, that via the Settlement Agreement, CAPTEC agreed, inter alia,

to transfer to FL Receivables all the franchise loans that PSCC had funded through the Interim

Warehouse and Security Agreement in release for it repayment obligations.  The Court likewise

concurs that in Section 11 of the Settlement Agreement, CAPTEC agreed to transfer to FL

Receivables "full legal and beneficial ownership in (i) the Contracts [and]  (ii) the Contract

Files" (as defined in the Interim Warehouse and Security Agreement) and that following the

same CAPTEC would have "no further right, title or interest in any such contracts or contract

files . . ." (FL Receivables Appendix Exhibit F at ¶ 11(a) & (b)).[6]

FL Receivables emphasizes that CAPTEC did not exclude or reserve to itself any rights or interests related to the Bagga Loans from the foregoing transfer.  This is entirely correct insofar as it goes, but it is off the mark.  It is an unpersuasive exercise in deductive reasoning, which is to say that FL Receivables posits that, since nothing seems to be excluded from the Settlement Agreement, everything (including RICO claims) must be included.  This, however, is precisely the reasoning rejected by the Circuit Court in both *Gulfstream* and *Lerman*.  Indeed, the exact notion was likewise recently rejected by the District Court in *In re Linerboard Antitrust Litigation*, 443 F.Supp.2d 703, 712 (E.D.Pa. 2006).  (rejecting claim that antitrust claims were impliedly transferred because only assets specifically excluded from an agreement to purchase corporate assets were not transferred under the agreement.)

In light of that fact, the Court surmises that the principal reason for which FL Receivables relies on the Settlement Agreement is because it is probative of a different point which FL Receivables stresses.  The entirety of its documentation, argues FL Receivables, effectively removes the specters of split recoveries and/or duplicative liability which were of concern in *Gulfstream* and *Lerman*.  Hence, it says, the reason for the rule is absent here.  If the reason for the rule no longer exists,  argues FL Receivables, the rule should be disregarded.  FL Receivables' factual premise has some appeal to it.  The question is whether it carries legal significance.

In this regard, it is not open to question that the statute of limitations within which

_____

[6] PSCC contributed the Contracts and Contract Files to FL Receivables upon its creation.

CAPTEC might have asserted RICO claims in its own right has expired.  PSCC, on the other

hand, is the sole beneficiary of the FL Receivables Trust.  The Court has little hesitancy in

agreeing with FL Receivables, therefore that risks of duplicative litigation and split recoveries

would not appear to be implicated in this particular case.

Yet, it cannot be overlooked that the Circuit Court clearly did not intend the federal rule

of common law which it promulgated to have application only where the risks portended were

present in the case before it.  Certainly there is no support for that proposition in the language of

either decision.  In fact, in *Gulfstream* the Court specifically acknowledged that because the case

before it dealt with but a single aircraft, with a readily identifiable purchase price, "risks" to the

direct purchaser rule were not necessarily present.  It nonetheless held that any "exception" to

the direct purchaser rule would be inappropriate.  995 F.2d at 439.  The *Lerman* Court did not

distance itself from this aspect of the *Gulfstream* holding, although "risks" of duplicative

litigation, etc., in the *Lerman* litigation do not appear to have been significant.

Irrespective of the foregoing, the Court does not view itself as having the liberty to mold

the *Lerman* rule as FL Receivables would apparently have it do.  Under the allocation of

authority established by three-tier system of federal courts this court is obliged to follow Third

Circuit precedent unless the precedent has been overruled by the Court of Appeals sitting *en*

*banc*, or by an Opinion of the Supreme Court that overrules the precedent.  *See: Hammond vs.*

*Commonwealth Mortgage Company of AM., L.P. (In re Hammond)*, 156 B.R. 943, 947-48 (E.D.

Pa. 1993) (Reed, J) (citing cases).

Accordingly, the Court declines FL Receivables invitation to derogate from the

*Lerman* express assignment rule because the "prudential concerns," or "risks" which appear to

have prompted the rule do not themselves appear to loom in this case.

### (c)  **The Limited Power of Attorney**

The Limited Power of Attorney is the document on which FL Receivables places the

most reliance.  It is found at Exhibit "H" in the FL Receivables Appendix.  It is a poor copy of

the original which is quite difficult to read, however it can be made out.  It is not lengthy and

reads in its entirety, as follows:

### LIMITED POWER OF ATTORNEY

Captec Financial Corporation, a Delaware corporation, and Captec
Financial Group, Inc., a Michigan corporation, and Captec Financial Group
Funding Corporation, a Michigan corporation, each having an address at 24 Frank
Lloyd Wright Drive, Lobby L, 4th Floor, Ann Arbor, MI 48105, each hereby
make, constitute and appoint FL Receivables Trust 2002-A, a Delaware statutory
trust  whose address is c/o Wilmington Trust Company, Rodney Square North,
1100 N. Market Street, Wilmington, DE 19890, Attn: Corporate Trust
Administration, and its successors and assigns, including without limitation any
vice president or more senior officer of any entity acting as trustee or
administrator of such trust, the true and lawful attorney to act for each entity, in
its name, place and stead, and for the use and benefit of each entity, to execute
and deliver assignments of deeds of trust and/or UCC financing statements, UCC
assignments or UCC amendments, assignments of mortgage, guaranties and title
insurance, assignments of insurance policies and benefits, assignments of legal
claims, settlements and judgments, endorsements of notes, and similar
instruments of transfer on behalf of Captec Financial Corporation, Captec
Financial Group, Inc. and/or Captec Financial Group Funding Corporation to
further assure the transfer to FL Receivables Trust 2002-A of the interests of
Captec Financial Corporation, Captec Financial Group, Inc. and/or Captec
Financial Group Funding Corporation in the Contract Documents relating to those
Contracts originated by Captec Financial Group Inc., and/or Captec Financial
Group Funding Corporation and specifically identified on the attached Schedule
1.

Giving and granting unto FL Receivables Trust 2002-A, full power and
authority to do and perform all and every act and thin whatsoever described
above, with full power of substitution or revocation, hereby ratifying and
confirming all that said attorney shall lawfully do or cause to be done by virtue
hereof.

This power of attorney is coupled with an interest and is irrevocable.  Any reproduced copy of this signed original shall be deemed to be an original counterpart of this Power of Attorney.

This Power of Attorney shall not be affected by any legal incapacity or dissolution, except as provided by statute.


Witnesses as to all:                    Captec Financial Corporation

_____                By: _____
_____                Name: _____
                                              Title: _____




                                              Captec Financial Group, Inc.

                                              By: _____
                                              Name: _____
                                              Title: _____

                                              Captec Financial Group Funding
                                              Corporation

                                              By: _____
                                              Name: _____
                                              Title: _____


Understandably, FL Receivables emphasizes and directs the Court's attention to the

language in the Power of Attorney imbuing the recipient with the authority to assign, inter alia,

legal claims, settlements and judgments.  This, says FL Receivables, is the language which,

together with the Settlement Agreement and the Assignment, closes the circle and establishes

that any RICO claims belonging to CAPTEC were assigned to FL Receivables.  Clearly,  this

overstates the case.

The Movants argue that the Limited Power of Attorney does not operate to assign

21

additional substantive rights beyond those set forth in the Assignment.  Rather, say the Movants,

the Limited Power of Attorney, by its very language, exists for the limited purpose of facilitating

the transfer to FL Receivables of CAPTEC'S interests in the assets specified in the Assignment.

The Movants have the better part of this argument.

The Limited Power of Attorney plainly states that it is given to further assure the transfer

to FL Receivables of the interests of CAPEC in the "Contract Documents' relating to the Bagga

Loans.  The Court notes that the Assignment itself refers not to Contract Documents, but to the

transfer of Contracts and Contract Files.  However, the Assignment also recites that capitalized

terms in the Assignment (such as Contracts and Contract Files) shall have the same meanings set

forth in the Interim Warehouse and Security Agreement.  When one refers back to that

document, one sees that the phrase Contract File includes all Contract Documents, as that phrase

is defined in the Interim Warehouse and Security Agreement.  The important point is that

conspicuously missing in the definition of the term Contract and the phrases Contract File and

Contract Documents is <u>any</u> reference to legal claims, demands, causes of action, etc. [7]

It is regrettable (for FL Receivables), but nonetheless clear to the Court, that the Limited

Power of Attorney did not assign independent assets to FL Receivables.  The Assignment is the

only document that operated to do so.  The Assignment, however, makes no reference to causes

of action or legal claims.  That being the case, FL Receivables simply cannot through the limited

Power of Attorney satisfy the *Lerman* express assignment requirement and establish its standing

---

[7] It is questionable, moreover, whether FL Receivables can rely to any extent on the Interim Warehouse and Security Agreement, inasmuch as the Settlement Agreement appears to have completely superceded it and, in fact, recites that consummation of the settlement would operate to terminate the former agreement.

to assert the RICO claims in its Complaint.

### (d) <u>The Documents Collectively</u>

As previously noted, FL Receivables urges the Court to read the Settlement Agreement,

the Assignment and the Limited Power of Attorney together, and thereby find in doing so that

the express assignment requirement is met.  Indeed, FL Receivables argues that, under *Kroblin,*

*supra*, the Court is bound to do so.

*Kroblin*, of course, spoke of two writings which were executed at the same time and

intertwined and said that they should be construed together.  805 F.2d at 107.  The Court notes

that none of the three documents in question here were actually executed on the same date,

however that may be putting too fine a point on things.

The Court will assume, for purposes of discussion, that the relevant documents, which

are certainly interwoven, were executed sufficiently close in time so as to be essentially

contemporaneous and thus deserving of integrated construction.  This still does not alter the

outcome.  That is to say that, whether you read them separately, or whether you read them

collectively, there is nothing in them which rises to the level of an express assignment of RICO

claims.

The Court turns lastly to certain arguments which FL Receivables makes in support of its

standing which are <u>not</u> predicated on its having already satisfied the express assignment rule.

At the outset, the Court observes that there it has considerable uncertainty over whether

one of the issues to which these arguments pertain is at all properly before it.  The Movants, for

instance, describe the issue before the Court as being "narrow" and "discrete" (see Transcript,

January 17, 2008 ("T") at 10).  By this, it appears clear to the Court that they mean to imply that

the sole issue before the Court is whether FL Receivables satisfies the *Lerman* express assignment rule with respect to Counts I and II of the Complaint.  FL Receivables appears to concur with this assessment of the issue that is before the Court.  (T at 47, 49).

Yet, perhaps because advocates can sometimes not restrain themselves, FL Receivables in its responsive brief took matters further by raising the argument that, even in the event of an adverse ruling on this issue, it could demonstrate standing to maintain Counts I and II of the Complaint in other ways.  Irrespective of the intent of their Motion, the Movants understandably have responded to such argument, both in writing and at oral argument.  As the parties have addressed themselves to the "additional" issues, the Court will do likewise.

i) <u>Reformation of the Documents</u>

FL Receivables argues, first, that by virtue of the authority it possess under the Power of Attorney it can execute a "Supplemental Assignment" on behalf of CAPTEC, in its own favor, "expressly" assigning to itself the subject RICO claims.  It has attached a copy of such a proposed document as Exhibit "X" to its brief in opposition to the Summary Judgement Motion.  Alternatively, FL Receivables argues that PSCC could execute a "Supplemental Contribution" to FL Receivables, once again expressly reciting that it includes any and all RICO claims which PSCC has against CAPTEC.  A copy of a proposed Supplemental Contribution document is attached to FL Receivables' brief as Exhibit "Y."  Neither of these arguments has merit.

Insofar as a Supplemental Assignment is concerned, the same would be futile because FL Receivables simply cannot assign to itself assets (such as causes of action and RICO claims) that were not transferred to it under the original assignment.  As previously discussed, the Limited Power of Attorney exists to aid in effectuating the transfer of assets covered by the Assignment.

It does not carry with it the right to expand the scope of those assets.

The Supplemental Contribution argument is equally unavailing. The Owner Trust Agreement and the Administration Services Agreements described *infra* at Footnote 2 make reference (just as all the other documents discussed supra) to Contracts, Contract Assets, Contract Files, and Contract Documents. The Court, however, can find no definition of any of these documents, in <u>any</u> document in FL Receivables' Appendix, which clearly and unambiguously reflects that any of the aforesaid terms and phrases include causes of action, demands, legal claims (RICO or otherwise), etc. The Court again underscores that PSCC and FL Receivables own only the assets transferred to them by CAPTEC. They have failed to demonstrate that the subject RICO claims were among such assets, and they cannot reform the substantive transaction under the guise of reforming the documentation which memorialized it.

ii) <u>Independent Standing</u>

FL Receivables' final argument, and the most troubling, is that it has standing to assert RICO claims independent of the CAPTEC assignment, because "the Defendants," including the Chawla Defendants, continued to commit predicate acts giving rise to RICO liability well <u>after</u> the finalization of the settlement between PSCC and CAPTEC. Theoretically, this could certainly serve as a basis for standing, but simply asserting as much in the final paragraph of its brief in opposition to the present Motion is clearly insufficient to resist it.

The Movants are correct that the allegations of post 2002 misconduct set forth in the Complaint, while sufficient for pleading purposes (as this Court concluded in its April 2007 Opinion) require amplification in the context of a Motion for Summary Judgement. Yet FL Receivables' brief is exceedingly sparse on this point. Its argument with respect to post August

2002 predicate acts consists, in its entirety, of a single sentence: "those predicate acts were directed at FL Trust as the holder of the Bagga Loans and included several acts of bankruptcy fraud committed by the Baggas and the Chawlas."  (FL Receivables' brief at pages 22-23)

The "independent" standing issue was, nevertheless, discussed in greater detail at the January 17, 2008 hearing.  The Movants characterize it as FL Receivables' "kitchen sink" argument (T at 30).  They argue, inter alia, that to the extent FL Receivables presses the argument at this juncture there is only one paragraph in the Complaint which sets forth a post 2002 allegation of wrongdoing against the Chawla Defendants.  Furthermore, with respect to this lone allegation, say the Movants, nothing in FL Receivables supporting papers is sufficient to demonstrate that the conduct in question is a legally sufficient "predicate act" for purposes of asserting a RICO claim, (T at 32-33), even though that deficiency was specifically raised in the Movants opening brief.  (*See* Movant's brief, October 10, 2007 at footnote 10)[8]

At oral argument FL Receivables elaborated on its position, insisting that it was "directly" harmed by conduct of the Chawla Defendants and making reference to fraud based "harm" related to the PSCC equipment purchase loans, inter company transfers between Bagga and Chawla entities, and the alleged false proof of claim in the Welcome Group Bankruptcy.  (T at 47, 48).

---

[8]  The "lone" post 2002 issue directed at them, say the Chawla Defendants, relates to the filing of a false proof of claim in the Bankruptcy case of an entity known as the Welcome Group. With respect to this, they argue that, even if the allegation is true, FL Receivables cannot demonstrate detrimental reliance and hence cannot establish harm.  In support, they append to their reply brief excerpts from a deposition transcript designed to show that FL Receivables did nothing to change its position based on the subject proof of claim.  (Chawla Reply Brief - January 15, 2008 at 13, Exhibit "A.")

The Court, for its part, has considerable difficulty dealing with the "independent

standing" argument because of the awkward and belated fashion in which it has been injected

into this proceeding.  As noted, the parties themselves have opined that the issue is not really

before the Court.  To the extent FL Receivables has endeavored to get it before the Court, its

brief and oral advocacy are utterly unhelpful.  Furthermore, other than the proof of claim aspect

of the "independent standing issue," the entirety of the documentation in its voluminous

appendix deals with pre 2002 acts and/or omissions which would implicate assignee standing,

not independent standing.  Finally, and as previously noted, Counts I and II of the Complaint are

directed at all defendants, whereas the present Motion seeks relief on behalf of the Chawla

Defendants only.

In view of these problems, the Court cannot possibly resolve with finality  the various

questions implicated by FL Receivables"independent standing" assertion, hence it will not

attempt to do so.  Rather, the Court will accept what both parties initially posit; to wit: that the

only issue directly joined before it is assignee standing.[9]  The Court, nevertheless, finds that to

simply leave matters in this posture will serve no good purpose.  It would appear that the most

reasonable inference to draw under the circumstances is that  Counts I and II of the Complaint

are intended to assert assignee liability only, and that FL Receivables' highly abbreviated

reference to the possession of independent standing to assert RICO claims, as set forth in a single

sentence on the last page of its brief, may be little more than an afterthought.  Recognizing,

however,  that the issue is not entirely free from doubt, the dismissal of Counts I and II of the

---

[9]  The Court views the afore-discussed document "reformation" issues to actually form
part of the assignee standing question and they are thus properly before it.

Complaint must be fashioned to suit.

Accordingly, Counts I and II of the Compalint, to the extent predicated on assignee standing, will be dismissed with prejudice as to all Defendants.  To the extent that FL Receivables wishes to assert Counts I and II based on having independent standing to do so, FL Receivables is directed to file an amended Complaint within two weeks from the date of this Opinion to clarify the precise RICO allegations it asserts, as between the Defendant Groups, and to specifically set forth the basis for its assertion of independent standing to bring such claims against the respective Defendants..

An appropriate Order follows.

By the Court:

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated:   February 6, 2008

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| JAMUNA REAL ESTATE, LLC | : CASE NO. 04-37130 |
| BAGGA ENTERPRISES, INC. | : CASE NO. 04-37132 |
| UNITED MANAGEMENT SERVICES, INC. | : CASE NO. 04-37136 |
| DEBTORS | : |

| | |
|---|---|
| MARVIN KRASNY, CHAPTER 7 | : |
| TRUSTEE OF JAMUNA REAL ESTATE LLC; | : |
| MARVIN KRASNY, CHAPTER 7 | : |
| TRUSTEE OF UNITED MANAGEMENT | : |
| SERVICES,INC.; GARY SEITZ, | : |
| CHAPTER 7 TRUSTEE OF | : |
| BAGGA ENTERPRISES, INC.; | : |
| AND FL RECEIVABLES TRUST 2002-A | : |
| PLAINTIFFS | : |
| v. | : |
| PRATPAL BAGGA; KHUSHVINDER BAGGA; | : |
| RAVINDER CHAWLA; HARDEEP CHAWLA | : |
| WELCOME GROUP, INC.; K&P REAL | : |
| ESTATE LLC; WORLD APPAREL PRODUCTS, | : |
| INC. D/B/A SJM TRADING CO., D/B/A | : |
| TEN TIGERS; AMERICAN MERCHANDISE | : |
| CO., INC., A/K/A AMERICAN | : |
| MERCHANDISING CO., INC.; | : |
| 21ST CENTURY RESTAURANT SOLUTIONS, | : |
| INC.; BRAND TRADE, INC.; | : |
| HB PROPERTIES, INC.; | : ADV. NO. 06-0128 |
| HB PROPERTIES LLP; SANT PROPERTIES; | : ADV. NO. 06-0129 |
| JOHN AND JANE DOES AND ABC | : ADV. NO. 06-0130 |
| COMPANIES | : |
| DEFENDANTS | : |
| | : |

# ORDER

**AND NOW**, upon consideration of the Motion for Partial Summary Judgment filed by

Defendants Ravinder Chawla, Hardeep Chawla, World Apparel Products, In., HB Properties,

Inc., HB Properties LLP, and Sant Properties (collectively the "Chawla Defendants") Plaintiffs'

Answer to the Motion, all related briefs filed by the parties, and after hearing held January 17, 2008, it is hereby:

**ORDERED,** that the Chawla Defendants' Motion for Partial Summary Judgment is Granted in part; and it is further:

**ORDERED,** that Counts I and II of the Plaintiffs' Complaint, to the extent predicated on standing as an assignee, are dismissed with prejudice as to all Defendants; and it is further:

**ORDERED,** that Plaintiff, FL Receivables is to file an Amended Complaint with respect to Counts I and II consistent with the within Opinion with two weeks of this date.

By the Court:

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated: <u>February 6, 2008</u>

2

<u>Interested Parties</u>:

George Conway, Esquire
Office Of The U.S. Trustee
833 Chestnut Street
Suite 500
Philadelphia PA  19106

Paul Madden, Esquire
Richard Simins, Esquire
Jeffrey Carbino, Esquire
Buchanan Ingersoll, PC
Eleven Penn Center  14th Floor
1835 Market Street
Philadelphia PA 19103-2985

Patrick FitzMaurice, Esquire
Thacher Profitt & Wood LLP
50 Main Street  5th Floor
White Plains, NY 10606

Patrick FitzMaurice, Esquire
Thacher Profitt & Wood LLP
2 World Financial Center
New York NY 10291

Lawrence Tabas, Esquire
Richad P. Limburg, Esquire
William Pelosi, Esquire
William Leonard, Esquire
Obermayer, Rebmann Maxwell & Hippel
1617 John F. Kennedy Blvd
19th Floor
Philadelphia PA 19103

Andrew Teitelman, Esquire
380 Red Lion Road
Suite 202
Huntingdon Valley, PA 19006